# CHARLESTON.

### L. L. WINKLEMAN & COMPANY v. FRED O. BLUE, STATE TAX COMMISSIONER.

Submitted January 23, 1917.   Decided January 30, 1917.

1. COMMERCE—*License   Tax—Brokers—Constitutional   Provisions—* *"Interstate Commerce."*

    In so far as the business of brokers holding a membership in a board of trade, stock exchange or other like institution in a state other than this and maintaining a branch office or place of business in this state, consists of the purchase of shares of the capital stock of corporations, in such board of trade, stock exchange or like institution, actual receipt of the purchased certificates representing such shares, for and on account of their patrons, and resale of such shares in such market, without actual delivery of the certificates to their principals or patrons, upon orders of purchase and sale given and received at such office or place of business, it is not interstate in character, within the meaning of the constitutional provision inhibiting state regulation of interstate commerce, and the agency is subject to regulation and taxation by this state, in respect to their business, even though other portions thereof may be interstate in the sense of said provision.  (p. 520).

2.  APPEAL AND ERROR—*Interstate Commerce—License Tax.*

   Upon a proceeding in resistance of a state license tax upon a business or occupation, a portion of which is not interstate in such sense, it is not necessary to determine whether other portions thereof are interstate, in order to maintain the state's right of taxation.  (p. 523).

3.  BROKERS—*License Tax—Statute.*

   A stock brokerage business broad enough in its scope to include, in every instance, an actual purchase or sale and delivery of the certificates representing the shares, to the brokers, in the former case, and by them, in the latter, is taxable under clause e of sec. 2, ch. 32, Code, and not under clause f of said section, even though the transactions are based upon marginal contracts under which deliveries may or may not be made by the brokers to their principals or patrons, and, in many instances, are not so made.  (p. 523).

Error to Circuit Court, Wood County.

Proceeding by L. L. Winkleman & Co. against Fred O. Blue, State Tax Commissioner.  Judgment for defendant, and plaintiff brings error.

*Reversed.  Judgment for plaintiff.*

*Marshall & Forrer*, for plaintiff in error.

*Fred O. Blue* and *Jno. T. Simms*, for defendant in error.

POFFENBARGER, JUDGE:

On this writ of error to a judgment rendered by the Circuit Court of Wood County, in a proceeding authorized by sec. 42a of ch. 32 of the Code, sustaining the action of the State Tax Commissioner, in his assignment of the plaintiffs in error, for the purposes of license and license taxation, to the class of persons that are taxable as licensees, under clause f of sec. 2 of ch. 32 of the Code, two questions arise:   (1) whether the plaintiffs in error, copartners and stock brokers of the city of New York, holding a membership in the New York Curb Association and having a branch office in the city of Parkersburg, West Virginia, are so engaged in interstate commerce as to place their business or vocation outside of and beyond the taxing power of the state of West Virginia; and, (2), whether, if the state can impose a license tax upon such

business, the plaintiffs in error belong to the class of persons taxable under clause e of said section at the rate of $50.00 per year, or the class taxable under clause f thereof, at the rate of $500.00 per year. For the last quarter of the fiscal year ending June 30, 1915, they paid to the clerk of the County Court of Wood County, $12.50. For the fiscal year, they paid to him, $50.00. Believing them to be taxable as persons belonging to class f, the State Tax Commissioner demanded of them an additional $112.50, for the last quarter for the fiscal year ending June 30, 1915, and made a draft upon them for said amount which they declined to pay. On a demand therefor by the sheriff of Wood County, under his power and authority to enforce payment, they paid said sum, on the 13th day of July 1915, and, on the 9th day of August 1915, instituted this proceeding in the Circuit Court to review the action of the State Tax Commissioner and obtain an order requiring said sum to be returned to them.

The character of their business, upon which the determination of both questions depends, is disclosed and explained in detail by Louis Friedman, their general manager, and Edward Neal, their local manager at Parkersburg. The State Tax Commissioner introduced no testimony, on his own behalf. In the course of the examination of these two witnesses, some references to the firm's books were made, and, in one instance, the prosecuting attorney demanded that they be placed in the record. Against this demand, impracticability of their production was urged, and the record discloses no action by the court on the motion. As the bill of exceptions declares the transcript contains all the evidence introduced upon the hearing, and neither the books nor any extracts therefrom appear in it, there can be no presumption that the judgment or order complained of rests upon, or is aided by, any contradiction of the oral testimony of the witnesses, by the books or records of the firm. Evidently, the books were never seen or examined by the court.

The branch office of the firm at Parkersburg, there took orders from its patrons, in person, and by telephone, telegraph and mail, for purchases and sales of shares of stock of corporations, to be executed by the firm, in the state of

New York, in what is known as the New York Curb Associa-
tion. It seems, in some instances, to have taken such orders
for execution, indirectly, on the New York Stock Exchange.
It did not effect or consumate any purchases or sales, in the
city of Parkersburg, nor elsewhere than in the city of New
York. In other words, it did not act as a broker or agent in
any purchases or sales at Parkersburg, between citizens of
that city, or of the state of West Virginia or of any other
place. All transactions in which it participated were ac-
tually done and completed in the state of New York. In some
instances, the patrons of the Parkersburg office deposited
there the entire amount of the purchase money, and then
the agency bought the stock in New York, paid for it there,
received the certificates of stock, caused transfers to be made
and new certificates to be issued and sent to them for deliv-
ery at Parkersburg. In others, only part of the purchase
money was so deposited and the brokers paid for stock in full,
advancing the remainder of the purchase money, charged the
advancement to the customer, as a debt bearing interest, and
held the certificates as collateral security for the loan. In both
classes of transactions, purchases of stock were sometimes
made without any deposit, but always upon the understand-
ing and agreement, express or implied, that the money would
be paid and, the brokers, relying upon such understanding,
always paid for the stock and had the certificates actually de-
livered to them in New York. It frequently happened, how-
ever, that no delivery was made to the customer. He would
leave the certificates in the hands of the broker, until such
time as it might be to his advantage to have the shares sold,
either to gain profits or to prevent losses. It was not un-
usual to take orders to buy and to sell at the same time, to
buy at the existing price and subsequently to sell at a higher
or lower price; nor for the brokers to sell on their own voli-
tion, on the falling of the market prices of the stocks bought
for their customers, to figures so low as to render the marginal
deposits insufficient security for their advancements or loans,
in order to prevent losses to themselves, as well as the cus-
tomers.

In about fifty per cent of the firm's business done through

the Parkersburg office, the portion thereof based upon marginal contracts in which deliveries were not made to the customers, there was no element of interstate commerce. *Ware & Leland* v. *Mobile County,* 209 U. S. 405. In respect of the nature of the business and the relations of the parties, that case was very similar to this. In it, the brokers represented their customers in dealings and transactions in cotton and grain consumated in New York, Chicago and New Orleans, all places outside of the state in which the local brokerage office was located. Here, the brokers represent customers in contracts pertaining to shares of the capital stock of corporations. In no other respect, do these cases materially differ. The following observations of the federal Supreme Court, in the case just cited conclusively show that the marginal contract portion of the business done by the plaintiffs in error, is not interstate in its character:

"But how stands the present case upon the facts stipulated? The plaintiffs in error are brokers who take orders and transmit them to other states for the purchase and sale of grain or cotton upon speculation. They are, in no just sense, common carriers of messages, as are the telegraph companies. For that part of the transactions, merely speculative and followed by no actual delivery, it cannot be fairly contended that such contracts are the subject of interstate commerce; and concerning such of the contracts for purchases for future delivery as result in actual delivery of the grain or cotton, the stipulated facts show that, when the orders transmitted are received in the foreign state, the property is bought in that state and there held for the purchaser. The transaction was thus closed by a contract completed and executed in the foreign state, although the orders were received from another state. When the delivery was upon a contract of sale made by the broker, the seller was at liberty to acquire the cotton in the market where the delivery was required or elsewhere. He did not contract to ship it from one state to the place of delivery in another state. And though it is stipulated that shipments were made from Alabama to the foreign state in some instances, that was not because of any contractual obligation so to do. In neither class of contracts,

for sale or purchase, was there necessarily any movement of commodities in interstate traffic because of the contracts made by the brokers. These contracts are not therefore, the subjects of interstate commerce any more than in the insurance cases, where the policies are ordered and delivered in another state than that of the residence and office of the company. The delivery, when one was made, was not because of any contract obliging an interstate shipment, and the fact that the purchaser might thereafter transmit the subject-matter of purchase by means of interstate carriage did not make the contracts as made and executed the subjects of interstate commerce.''

The non-interstate character of this portion of the business in question confers upon the state, clear and undoubted right to impose upon it a licence tax, whether the remaining portion thereof is interstate or not. The tax is imposed upon the business or occupation, not on the contracts or transactions constituting the business or attending it as incidents. An agent or broker doing both intrastate business and interstate business is subject to state taxation. *Flicken* v. *Shelby County Taxing District,* 146 U. S. 1; *Stockhard* v. *Morgan,* 185 U. S. 27; *Pennywitt* v. *Blue,* 73 W. Va. 718. It is therefore unnecessary to enter upon any inquiry as to whether the contracts between the agents and their customers bound them to transmit the certificates of shares from New York to Parkersburg, in those instances in which stocks were bought outright, or whether, if the contracts did impose such obligations, the certificates of stock to be so transmitted were articles of interstate commerce.

Clause e of sec. 2 of ch. 32, Code, relates to any person who shall ''Practice the business of real estate agent, stock broker, merchandise broker or other broker, by buying or selling for others stocks, securities, or any other property, for a commission or reward.'' Clause f of said section pertains to any person who shall ''Practice such business by carrying on what is commonly known as a bucket shop, or acting as agent for any person, firm or corporation carrying on such business; or engaging in transactions for the purchase or sale for others of grain, provisions, stocks, securities, merchandise or other

property wherein the parties thereto or the broker intend that such transactions shall be settled according to the public market quotations on any board of trade or exchange, and without a *bona fide* transaction on such board of trade or exchange, or intend that such transaction may be deemed terminated when such public market quotations shall reach a certain figure, or intend that such property shall be resold before or at the time fixed in such transaction for the delivery of such property and that the difference between the contract price and the market price thereof shall be paid or received without the prior receipt or delivery of such property under the former sale.''

The transactions in which the plaintiffs in error represent their customers cannot be brought within the terms of any of the provisions of clause f, which seem to be three in number. In the first, lack of a *bona fide* transaction on the board of trade or stock exchange, is a requisite. In the business under consideration here, there is an actual sale and a *bona fide* transaction in every instance. In the next class, there must be intent that the transaction is to be deemed terminated when the public market quotations shall reach a certain figure. In the transactions of these brokers, there is no such termination. If the stocks bought by them are not delivered to their customers, they are resold and the proceeds of the sales brought into settlements with their customers. The coincidence of the quotations with the figures agreed upon does not terminate the transaction. It causes an actual sale of the stock. The sale and settlement terminate the contract. In the third class, it is essential that there be no prior receipt or delivery of the property under the former sale. In all of the transactions conducted by these brokers, the certificates of shares are actually delivered to them, for account of their customers, and, in law, such deliveries are deliveries to the customers. The several transactions described in the subclauses or provisions of clause f are different forms of mere betting on the public market values of stocks, grain, provisions, merchandise and other things, as disclosed or fixed on boards of trade, stock exchanges and other like institutions, and gambling on the basis of such prices. As such, they are

absolutely prohibited, under heavy penalties, in Pennslyvania, New York, Ohio and other states. Transactions on boards of trade and stock exchanges sufficiently broad to include actual purchases and sales and deliveries in pursuance thereof are uniformally held by the courts not to fall within the condemnation of such statutes. *Winward* v. *Lincoln,* 51 Atl. Rep. 106; *Hatch* v. *Douglass,* 48 Conn. 116; *Ward* v. *Vosburg,* 31 Fed. Rep. 12; *Hopkins* v. *O'Kane,* (Pa.), 31 Atl. 421; *Peters* v. *Grimm,* 129 Pa. 162; *Mann* v. *Bishop,* 136 Mass. 495; *Post* v. *Leland,* 184 Mass. 601. This uniform and logically well sustained interpretation of the statute, in the ascertainment of the rights of parties to transactions alleged to be within it, must be allowed to govern the solution of questions of taxation arising under it. The true meaning depends upon the legislative purpose and intention, whatever may be the nature of the proceeding in which it becomes involved.

Upon these principles and conclusions, the judgment and order of the circuit court will be reversed and annulled, the finding and decision of the State Tax Commissioner, complained of, set aside, the annual license tax payable by the plaintiffs in error, as brokers, ascertained to be $50.00 and the State Tax Commissioner's collection of $112.50 from them, as license tax for the last quarter of the fiscal year ending, June 30, 1915, adjudged to have been made without warrant of law; and costs in this court will be adjudged to the plaintiffs in error, the parties substantially prevailing.

*Reversed.    Judgment for plaintiff.*